## APPEAL OF SIEMS, CAREY—H. S. KERBAUGH CORPORATION.

Docket No. 2777.    Promulgated January 20, 1927.

A promissory note payable to the Secretary of War, executed by the three owners of a corporation in their individual capacity, and securities individually owned or borrowed by such owners, which note and securities were turned over to the corporation and by it put up as security for the repayment of an advance made to it by the United States in aid of the performance of a supply contract between the corporation and the United States, and returned to said owners upon the termination of said supply contract, *held* not to be part of the invested capital of the corporation.

*George A. O'Donohue, Esq.,* for the petitioner.
*M. N. Fisher, Esq.,* for the Commissioner.

This appeal involves the correctness of a deficiency in income and profits tax of $102,884.13 for the calendar year 1919. Petitioner claims that a certain promissory note for $1,000,000, executed by three individuals and made payable to the Secretary of War, together with certain securities of the value of $750,000, put up with the War Credits Board as security for the performance of a contract, should be included in computing its invested capital.

### FINDINGS OF FACT.

In May, 1918, a partnership composed of C. P. Siems, W. F. Carey and H. S. Kerbaugh, experienced railroad contractors, was negotiating with the War Department for a contract covering the construc-

tion of a railroad into the spruce belt in the State of Washington and a second contract for the production and delivery of spruce flitches. After several days of conferences the partnership requested its counsel to come to Washington to advise them during the negotiations. Before leaving New York counsel for the partnership took steps to organize the petitioner corporation under the laws of the State of Maine. He dictated the charter over the telephone to Portland, Me., and three persons, as "dummies," signed it and filed it at the State Capitol. The charter was later sent by mail to the parties in Washington. The minimum amount of $1,000 required by the Maine law to be paid in was so paid in and went for organization expenses. No stock was ever issued to cover this amount or for any other purpose. No stock certificates or stock books were ever printed, and the only arrangement as to the stock was an oral agreement by Siems, Carey, and Kerbaugh that they would take the stock up to $1,500,000 and pay for it as it might be needed. This was never done. Siems, Carey, Kerbaugh, and their counsel, Clarke, were made directors of the corporation.

The War Department was under great pressure to get these contracts placed and the railroad constructed so that the spruce timber essential for airplane production could be delivered as early as possible. The first contract executed was for the construction of the railroad, the work on which was actually commenced by the corporation before the contract was signed on May 18, 1918. The corporation did not have sufficient funds to finance the contract and applied to the War Department for advance payments. An advance payment of $500,000 was authorized by the War Credits Board under a supplemental contract. To secure this advance the corporation gave its note, endorsed by Pliney Fiske, of Harvey Fiske & Son, and a surety company bond for $500,000 furnished by the Fidelity & Deposit Company of Maryland. This contract is not directly involved in the present case, but is referred to as one of the steps in the proceedings leading up to the production contract.

In the second contract with the Government the petitioner agreed to deliver a minimum of 250,000,000 feet, board measure, of spruce timber flitches between December, 1918, and November, 1919, at a price ranging from $60 to $100 per thousand feet. It was stipulated in the contract that in the event of cancellation settlement should be made on the basis of cost plus 7 per cent. This contract was dated May 12, 1918, and immediately thereafter contractors applied to the War Credits Board to authorize advance payments on said contract. The Board offered to authorize a total advance of $6,000,000, in installments of $1,000,000 each, upon the execution by the corporation of its note for $6,000,000, secured by $2,000,000 of collateral. Peti-

tioner corporation was unable to furnish the security nor was its banker, Harvey Fiske & Son, willing to undertake the transaction. The individuals composing the corporation made every effort to secure another institution to finance or underwrite the corporation, but without success. After considerable negotiation the War Credits Board asked counsel for the corporation what collateral Siems, Carey and Kerbaugh could provide. Their reply was that they could produce $750,000 in collateral and no more for this purpose. After further conferences the War Credits Board agreed to approve an advance of $750,000 upon the signing by the individuals of a joint and several promissory note for $1,000,000 and the deposit of $750,000 of bonds as collateral. The supplemental agreement incorporating the above understanding was drawn and signed by the parties and a joint and several note for $1,000,000, payable to the Secretary of War and signed by Chester P. Siems, William F. Carey and H. S. Kerbaugh as individuals, together with an aggregate of $750,000 of stocks and bonds, was turned over to the War Credits Board.

The securities aggregating approximately $750,000 which were put up as collateral for the $1,000,000 note came from the following sources: $370,000 in miscellaneous stocks personally owned by Siems; $130,000 in miscellaneous stocks personally owned by Carey; and $250,000 of Liberty bonds borrowed from Mrs. Stone, wife of Stone, of Hayden, Stone & Co. The partnership of Siems and Carey also contributed its check for $35,000. At the time these securities were turned over by Siems to Clarke as counsel for the petitioner corporation, the following statements were made by Siems:

Q. In delivering the securities to you, what statement, if any, did Mr. Siems make as to the status which the bonds were to have after their delivery to you, or as to the purpose for which you were to use them?

A. Mr. Siems and I had been trying to raise the required collateral for the corporation, and we could not make it. He handed me these securities and said, " I will fix it. I will turn these into the corporation." That was all he said.

Q. Did he use those identical words?

A. Those were his identical words, to the best of my recollection, " I am turning these over to the corporation." He said no more than that.

The above securities were never assigned to the corporation and were never taken up on any of its books.

On June 20, 1918, the Bankers Trust Co. of New York, agent for the War Credits Board, receipted for the securities deposited with it in the following language: " To be held for account and subject to the order of War Credits Board as per letter of Siems, Carey–Kerbaugh Corporation, June 20, 1918." All interest collected by the Bankers Trust Co. on the securities during the time they were held was remitted to the corporation at its office in Seattle, Wash.

Shortly after November 11, 1918, the United States canceled its production contract with the petitioner and proceeded to make settlement under the terms thereof. On August 14, 1919, the War Credits Board returned to the petitioner corporation the note and securities that had been placed with it, and they were immediately returned to the original owners from whom they were obtained—$370,000 of personally owned securities to the estate of Siems, $130,-000 to Carey, and $250,000 of Liberty bonds to Hayden, Stone & Co. There was no formal corporate action of any kind indicating a distribution of capital assets nor any other corporate action with reference to the return of the securities.

### OPINION.

VAN FOSSAN: The question to be determined in this case is whether or not a note for $1,000,000 and securities aggregating $750,000 in value should properly have been included in the invested capital of the petitioner. The evidence is that the corporation was a mere shell. It never issued any stock, even for the $1,000 paid in for organization expenses. It printed no stock certificates. So far as the record shows it had none of the usual corporate books. In the financial extremity in which they found themselves the three owners of the corporation signed personally and individually a promissory note for $1,000,000, while two of the three owners contributed or loaned to the fund of $750,000 to be put up as security such personally owned securities as they had available. The Siems-Carey partnership contributed its check for $35,000 and there was also contributed $250,000 in Liberty bonds " borrowed under (Clarke's) guidance from Mrs. Stone, wife of Stone, of Hayden, Stone & Company." Practically the sole evidence that these securities were " paid in " to the corporation is to be found in the statement attributed to Siems (deceased before the hearing) contained in the testimony of Clarke set out in the findings of fact, in which he states, " I will turn these into the corporation," and, later, " I am turning these over to the corporation." The intention to pay in capital or a mere statement of such an intention standing alone is not enough. The actions of the parties and the corporation must evince the intention and effect the actual paying in. No single step was ever taken either by the stockholders or the corporation other than as outlined to effectuate the transfer to the corporation. The securities were never assigned to the corporation by their owners nor were they taken up on the books of the corporation. Every circumstance surrounding the transaction goes to show that the securities never belonged to the corporation. The corporation paid nothing for them and gave nothing in return. Title never passed

to the corporation. It merely borrowed them from the individuals who owned them and upon the conclusion of their use returned the same securities to the sources from which they came.

When the securities were released by the War Credits Board and returned to their individual owners there was no corporate action of any kind taken in connection with such return. No liquidating dividend or other distribution of assets was made and there is no evidence of the securities ever officially passing through the hands of the corporation.

Whether or not property is paid in to a corporation depends upon the facts surrounding the transaction and not upon any single statement to the effect that they were paid in. This is a conclusion that may or may not be justified by the facts of the case. In this case it clearly was not justified. From the record we are convinced that neither the note nor the securities were ever " paid in " to the corporation within the proper legal meaning of that term.

There is another ground upon which it would appear to be necessary to find against the contention of petitioner. Upon the evidence it is clear to us that the securities were borrowed for a specific and temporary use and were later returned to their individual owners. They were never assigned to the corporation and title never passed. It follows, therefore, that if they were capital at all they were borrowed capital, which is expressly excluded from invested capital by section 326(b), which reads:

As used in this title the term " invested capital " does not include borrowed capital.

The provisions of the above section of the law were applied adversely to the taxpayer in the *Appeal of Warren-Lamb Lumber Co.*, 1 B. T. A. 786, 788, where the Board says:

It thus appears that even though we should accept the allegations of the taxpayer as evidence that Lamb, at the time when he made these advances, intended that the sum should become part of the invested capital of the business of the taxpayer, such intention was not actually carried out and made effective until the time when the notes, given by the taxpayer as evidence of the advances, were actually exchanged for the preferred stock shares of the taxpayer company, and this exchange not having taken place until after the close of the year 1917 we must necessarily hold that during the year 1917 these advances represented borrowed capital and not invested capital.

The evidence in support of the taxpayer was much stronger in the above-cited case than in the instant case. See also *Appeals of Kelly-Buckley Co.*, 1 B. T. A. 1154, and *Harrolds Motor Car Co.*, 5 B. T. A. 429.

*Judgment will be entered for the Commissioner.*

LITTLETON, SMITH and TRUSSELL dissent.

MILLIKEN did not participate.